UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES MASON ALLEN,

        Petitioner,

vs.

CAROL R. HOWES,

        Respondent.
_____/

Civil Action No.
07-CV-11863

HON. BERNARD A. FRIEDMAN

## **OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Charles Mason Allen, ("Petitioner"), presently confined at the Lakeland Correctional Facility in Coldwater, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his application, filed by attorney Marla R. McCowan of the State Appellate Defender Office, petitioner challenges his conviction and sentence for second-degree murder, M.C.L.A. 750.317. For the reasons stated below, the Court will deny the application for writ of habeas corpus.

### **I. Background**

Petitioner was convicted of the above charge following a jury trial in the Wayne County Circuit Court. Petitioner's counsel has provided a detailed statement of facts in the petition for writ of habeas corpus. The Court will therefore accept the factual allegations contained within the habeas petition insofar as they are consistent with the record, because the respondent has not disputed them. *See Dickens v. Jones,* 203 F. Supp. 2d 354, 360 (E.D. Mich. 2002). Because the facts of this case have been repeated numerous times, they need not be repeated here in their entirety. Therefore, only a brief overview of the facts is required. *See Nevers v. Killinger,* 990 F. Supp. 844,

1

847 (E.D. Mich. 1997). As stated by the Michigan Court of Appeals,

> Defendant's conviction arises from his alleged involvement in the October 6, 1990, shooting death of Niambi Kumasi. Alvin Smith testified that, in October 1990, he was "selling drugs" out of his Manor Street house in Detroit, and learned from his customers that neighborhood rival drug dealers were "undercutting" him by selling drugs at a lower price. He indicated that, on October 3, 1990, between 11:30 and 11:45 p.m., he and two associates went to the rival drug dealers' house, located at 20007 Meyers, and, after confirming that no one was in the house, they "[s]hot it up." Smith and his two associates fled in Smith's white Mercury Cougar.
>
> In a statement made to the police, defendant confirmed that, in October 1990, he was selling drugs out of the Meyers house with Robert Issac (a/k/a "Mack"). Mack's associates included Phillip Whitfield, Nate Jennings, and Ronald Williams. Defendant stated that he was not at the Meyers house when the shooting occurred, but a neighbor told him that three people had "shot it up." Defendant called Mack, whom he "work[ed] for," and told him what happened. In response, Mack told defendant that he saw the shooting, that he and Nate tried to return fire as the perpetrators were leaving, and that "we'd get with them in time."
>
> Smith testified that, between 11:00 p.m. and midnight, he was at his Manor home with several associates, including the victim. They heard a knock on the door and, as one of Smith's associates went to answer it, shots were fired into the house. Smith estimated that "at least" forty bullets were fired into the home. Smith attempted to return fire. According to medical evidence, the victim was shot three times, including a fatal shot by a high-powered bullet that struck her skull.
>
> Defendant stated that, when he heard the gunshots, he remarked to his friends "that's probably Mack shooting up the place." Shortly after the shooting stopped, defendant went to Phyllis Weiss' house to use the phone. After leaving Weiss' house, defendant rode down Manor, saw the police, and told his friends "we hit them," and that he "thought Mack and them did it."
>
> Weiss testified that, on October 6, 1990, she allowed defendant to use her phone several times throughout the day. At approximately 10:30 p.m., while defendant was on the phone, Weiss heard him say, "He found out, we're going to take care of it." She further indicated that, ten to fifteen minutes after the shooting, defendant came to her house, "out of breath," "telling [her] to hurry up and open the door and let him in." Defendant used her phone, and she heard him say, "It's been taken care of."
>
> \* \* \* \*
>
> Defendant was arrested on October 8, 1990, on an unrelated drug charge. At that time, he was not charged with second-degree murder. Defendant made a statement

to the police in this case on October 10, 1990. Subsequently, defendant was offered immunity from charges in this case in exchange for his testimony against Whitfield, Jennings, and Isaac, who had been charged with first-degree murder in connection with the victim's death. On November 3, 1990, defendant was arraigned on the drug charge, and a preliminary examination was held on November 15, 1990. At the preliminary examination of Whitfield, Jennings, and Isaac, defendant invoked his Fifth Amendment privilege not to testify, and was thereafter released from custody. Defendant then left Michigan. On June 19, 1991, a felony warrant was issued for defendant's arrest for second-degree murder. In May 2001, the Alliance Fugitive Task Force learned about defendant's whereabouts, and obtained a federal Flight to Avoid Prosecution Warrant. On February 8, 2002, FBI agents arrested defendant in Georgia. On April, 25, 2002, defendant was arraigned on the second-degree murder charge, and his trial commenced on March 26, 2003.

*People v. Allen,* 2005 WL 1489592, at **1-2 (Mich. Ct. App. Jun. 23, 2005) (footnote omitted).

Petitioner's conviction was affirmed on appeal. *Id., reconsideration den.* No. 248743 (Mich .Ct. App. Aug. 12, 2005); *lv. den.* 474 Mich. 1026; 708 N.W. 2d 419 (2006). Additional facts will be discussed when addressing petitioner's claims. Petitioner now seeks the issuance of a writ of habeas corpus on the following grounds:[1]

> I. Petitioner's conviction for second-degree murder must be reversed where his trial commenced more than eleven and one half years after the warrant for his arrest issued in violation of his state and federal constitutional rights to a speedy trial.
>
> II. Mr. Allen was convicted on insufficient evidence of 2nd degree murder where the element of intent was not proven beyond a reasonable doubt, viewing all the evidence in a light favorable to the prosecution.

## II. Standard of Review

Title 28, § 2254(d) imposes the following standard of review for habeas cases:

---

[1] Petitioner originally sought relief on five claims. However, on November 5, 2007, petitioner filed a motion for leave to file an amended petition for writ of habeas corpus and an amended petition for writ of habeas corpus [Dkt. ## 4 and 5], in which he sought to delete his third, fourth, and fifth claims and proceed only with the first two claims raised in his original habeas petition. The Court granted petitioner's motion for leave to file an amended petition on November 6, 2007.

3

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

### III. Discussion

**A. Claim # 1. The speedy trial claim.**

Petitioner first claims that he was deprived of a speedy trial, because he was not brought to trial until over eleven years after a felony warrant was issued for his arrest on June 19, 1991.

The Sixth Amendment guarantees a criminal defendant the right to a speedy trial. U.S. Const. Amend. VI. To determine whether a speedy trial violation has occurred, the court must

4

consider the following four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his speedy trial right, and (4) the prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). No single factor is determinative, rather a court must weigh them and engage in a "difficult and sensitive balancing process" to determine whether a constitutional violation has occurred. *Id*. at 533.

The length of delay is a "triggering factor" because "until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker,* 407 U.S. at 530. Therefore, to trigger a speedy trial analysis, the accused must allege that the interval between the accusation and the trial has crossed the threshold dividing ordinary from presumptively prejudicial delay. *Doggett v. United States,* 505 U.S. 647, 651-52 (1992). Courts have generally found post-accusation delays that approach one year to be "presumptively prejudicial." *Id.* at 652 n.1; *United States v. Brown,* 90 F. Supp. 2d 841, 846 (E.D. Mich. 2000).

Petitioner's speedy trial claim is without merit for several reasons. First, as the Michigan Court of Appeals indicated, *see Allen*, 2005 WL 1489592, at \*\*2-3, petitioner has miscalculated the delay in bringing him to trial from the issuance of the arrest warrant in 1991 until the date of trial in 2003. The Supreme Court has noted that it is "[e]ither a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment." *United States v. Marion,* 404 U.S. 307, 320 (1971). Therefore, although the invocation of the Speedy Trial Clause of Sixth Amendment need not await indictment, information or other formal charge, the provision of the Speedy Trial Clause does not reach to the period prior to arrest. *Id.* The issuance

5

of an arrest warrant does not, in and of itself, trigger the right to a speedy trial. *See United States v. Ramos,* 586 F. 2d 1078, 1079 (5th Cir. 1978).

Petitioner was not arrested on this charge until February 8, 2002. Petitioner was brought to trial on March 26, 2003, a little under fourteen months after his arrest. The total time that elapsed between petitioner's arrest and trial was a little less than fourteen months, and not eleven years, as he claims.[2] Because the fourteen month delay between petitioner's arrest and trial is nonetheless presumptively prejudicial, this Court must engage in an examination of the remaining *Barker* factors. *See United States v. Bass,* 460 F.3d 830, 836 (6th Cir. 2006).

This Court first looks at the second *Barker* factor, the reasons for the delay. The purpose of this inquiry by the Court is to determine "whether the government or the criminal defendant is more to blame for [the] delay." *Maples v. Stegall,* 427 F.3d 1020, 1026 (6th Cir. 2005) (citing *Doggett*, 505 U.S. at 651).

Trial was scheduled to begin on June 26, 2002. Because the crime had taken place several years previously, the prosecutor moved for an adjournment to obtain certain documents and transcripts, which the trial court granted. These transcripts were obtained in November of 2002. Petitioner filed a motion to quash the information on September 18, 2002, which was ultimately argued and denied by the court on November 15, 2002. The trial court set the trial date for

---

[2] Moreover, the record establishes that petitioner appears to have fled the State of Michigan to avoid prosecution on a pending drug charge. Petitioner, by his own admission, moved to Florida and Georgia, where he began using several aliases. Even if the State of Michigan made mistakes in its search for petitioner, the primary responsibility for the almost eleven year delay between the issuance of the arrest warrant in 1991 and the arrest of petitioner in Georgia in 2002 cannot be attributed to the State of Michigan, for purposes of a Sixth Amendment speedy trial claim, in light of petitioner being on fugitive status and his use of aliases to avoid detection by the State of Michigan. *See Wilson v. Mitchell*, 250 F. 3d 388, 395 (6th Cir. 2001); *United States v. Campbell,* 525 F. Supp. 2d 891, 899-900 (E.D. Mich. 2007).

December 9, 2002. Defense counsel thereafter requested an adjournment to review the transcripts, which had only been recently obtained by the prosecutor. The trial court granted the motion for adjournment and set a new trial date for March 17, 2003. On March 14, 2003, petitioner's counsel filed a motion for a *Walker* hearing to suppress petitioner's statement.[3] Both the *Walker* hearing and petitioner's trial were put over to March 26, 2003.

In evaluating a Sixth Amendment speedy trial claim, a court should consider whether some of the delay is attributable to the defendant. *See United States v. Brown*, 498 F. 3d 523, 531 (6th Cir. 2007). Defense counsel's request for a continuance in order to prepare for trial would be attributable to the defense for purposes of a speedy trial analysis. *See, e.g., United States v. Banks,* 27 Fed. Appx. 354, 358 (6th Cir. 2001). Likewise, any delays caused by petitioner's filing of his various pre-trial motions is attributable to the defense for purposes of a speedy trial determination. *See Norris v. Schotten,* 146 F. 3d 314, 327 (6th Cir. 1998). In addition, the need to conduct an evidentiary hearing on petitioner's motion to suppress is also a delay that would be attributable to petitioner. *See United States v. Kaylor,* 877 F. 2d 658, 663 (8th Cir. 1989).

Petitioner's claim also fails because there is no evidence in the record that any part of this delay was intentionally caused by the trial court or the prosecution. *Norris*, 146 F. 3d at 327-28; *Shanks v. Wolfenbarger,* 387 F. Supp. 2d 740, 748 (E.D. Mich. 2005). There is nothing in the record to indicate a "willful attempt" by the prosecution to delay the trial, *Burns v. Lafler,* 328 F. Supp. 2d 711, 722 (E.D. Mich. 2004) (quoting *Davis v. McLaughlin*, 122 F. Supp. 2d 437, 443 (S.D.N.Y. 2000)), nor is there any evidence that the prosecution intentionally delayed the trial to gain a tactical advantage over petitioner. *Id.; See also Brown*, 498 F. 3d at 531.

---

[3] *People v. Walker,* 374 Mich. 331; 132 N.W. 2d 87 (1965).

With regard to the third *Barker* factor, "[t]he defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Barker*, 407 U.S. at 531-32. A criminal defendant's "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Id.* Because petitioner never asserted his right to a speedy trial before the trial court, this "weighs heavily toward a conclusion that no Sixth Amendment violation occurred." *Brown,* 498 F. 3d at 532.

Finally, petitioner is not entitled to habeas relief on his speedy trial claim because he has not shown that his defense was prejudiced by this delay. *Burns,* 328 F. Supp. 2d at 722. Of the four factors to be assessed in determining whether a defendant's speedy trial rights have been violated, prejudice to the defendant is the most critical one. *See Trigg v. State of Tenn.,* 507 F. 3d 949, 954 (6th Cir. 1975)

Petitioner first argues that he was prejudiced by the delay in bringing him to trial because the victim's boyfriend, who was sitting next to her at the time of the shooting and immediately fled the scene, has since died. There is no indication, however, when the victim's boyfriend died. Because petitioner has failed to show that the victim's boyfriend died between the time that he was actually arrested and brought to trial on this charge, he is unable to establish a violation of his speedy trial rights. *See e.g. Randle v. Jackson*, 544 F. Supp.2d 619, 632 (E.D. Mich. 2008). More importantly, because petitioner does not state what testimony the victim's boyfriend could have offered on his behalf, petitioner's vague and unsupported assertions do not support a finding that his defense was impaired by the delay in time in bringing him to trial. *Bass,* 460 F. 3d at 838.

Petitioner also claims that his defense was impaired because Phyllis Weiss was no

8

longer a crack addict like she was at the time of the murder. As the Michigan Court of Appeals noted in rejecting this portion of petitioner's claim, the fact that Weiss had been a crack cocaine addict was brought before the jury at the time of petitioner's trial. Moreover, a change in a defendant's ability to impeach an unfavorable witness due to the change over time in circumstances under which a witness would testify does not establish prejudice for purposes of a speedy trial claim. *See, e.g., United States v. Mohawk,* 20 F.3d 1480, 1486-87 (9th Cir. 1994).

Petitioner has failed to show that he was deprived of his Sixth Amendment right to a speedy trial. Petitioner is not entitled to habeas relief on his first claim.

**B. Claim # 2. The sufficiency of evidence claim.**

Petitioner next contends that there was insufficient evidence to establish that he acted with malice aforethought, so as to support his conviction for second-degree murder. The Michigan Court of Appeals rejected petitioner's claim, noting that the evidence was sufficient to allow a rational trier of fact to infer that petitioner acted with malice:

> Evidence showed that, after defendant's drug house was shot up, Mack, one of defendant's superiors, told him that the culprit drove a white Cougar, that they returned fire on the car as it was leaving, and that "we'd get with them in time." Defendant admitted that Mack told him to "find out where they live [d]." In addition to defendant's own admissions, Weiss heard defendant say that "he wanted to find out who it was that had done it," and that "it was someone driving a white Cougar." As a result of his asking around, defendant learned the driver's name. He later saw the white Cougar, had a brief altercation with the driver, and, after the car left, followed the car to obtain its destination. By his own admission, after learning where the driver resided, defendant said, "they were going to get theirs." Defendant called Whitfield, who is "Mack's partner," and reported the driver's name, and that he "found out" his location. Although Whitfield told defendant that he would call Mack, defendant admitted that he also called Mack and told him the driver's location. Defendant subsequently saw Williams, another of Mack's associates, and also told him that he "found out" where the driver lived. Defendant admitted that he got into the car with Williams and "pointed out the house to him." At the time, the white Cougar was still in the driveway. Defendant admitted that Williams immediately called Mack, and said he "knows where the spot is." Weiss

9

subsequently heard defendant say "[h]e found out, we're going to take care of it."

There was evidence that Smith's house was subsequently shot up, during which the victim was killed. Defendant admitted that, from a friend's house, he heard the gunfire and remarked "that's probably Mack shooting up the place." Additionally, after the shooting, a witness heard defendant say, "It's been taken care of." Defendant admitted that he subsequently rode past the house and, after seeing the police cars, said to his companions, "we hit them." Additionally, by his own admission, defendant knew that Mack and his associates had shot up other places in the past, with the most recent being "about four months" before this incident, and believed that someone had been killed during one of the incidents. Defendant also admitted his awareness that Mack owned "a chrome three fifty-seven, an AK, a twelve gauge pump, and an AR15." An officer testified that an AK and AR are "high-powered, semi-automatic rifles."

*Allen,* 2005 WL 1489592, at \*\*4-5.

A habeas court reviews claims that the evidence at trial was insufficient for a conviction by asking whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Scott v. Mitchell*, 209 F. 3d 854, 885 (6th Cir. 2000) (citing to *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Because a claim of insufficiency of the evidence presents a mixed question of law and fact, this Court must determine whether the state courts application of the *Jackson* standard was reasonable. *See Dell v. Straub*, 194 F. Supp. 2d 629, 647 (E.D. Mich. 2002). A conviction may rest on circumstantial evidence and a federal habeas court reviewing the sufficiency of evidence to support a conviction need not rule out all possible interpretations of the circumstantial evidence. *Id.* A conviction may be based upon circumstantial evidence as well as inferences based upon the evidence. *Id.*

Under Michigan law, conviction of second-degree murder requires proof of: (1) a death; (2) caused by an act of the defendant; (3) with malice; and (4) without justification or excuse. *Kelley v. Jackson,* 353 F. Supp. 2d 887, 891 (E.D. Mich. 2005) (citing *People v. Goecke*,

10

457 Mich. 442, 463-64; 579 N.W. 2d 868 (1998)). To prove malice, the prosecution must establish that the defendant has the intent to kill or do great bodily harm, or has created and disregarded a very high risk of death. *Id.* Malice for second-degree murder can be inferred from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm. *Long v. Stovall,* 450 F. Supp. 2d 746, 753 (E.D. Mich. 2006) (citing *People v. Djordjevic*, 230 Mich. App. 459, 462; 584 N.W.2d 610 (1998)); *See also Hill v. Hofbauer,* 195 F. Supp. 2d 871, 885 (E.D. Mich. 2001). "The offense of second-degree murder 'does not require an actual intent to harm or kill, but only the intent to do an act that is in obvious disregard of life-endangering consequences.'" *Long,* 450 F. Supp. 2d at 753 (quoting *People v. Mayhew*, 236 Mich. App. 112, 125; 600 N. W. 2d 370 (1999)).

In the present case, the evidence was sufficient for a rational trier of fact to conclude that petitioner acted with malice aforethought, so as to support his conviction for second-degree murder. Petitioner assisted his accomplices in locating the vehicle that had been driven by the persons who had shot up his house and later followed this vehicle to the residence where the driver lived. After discovering the driver's residence, petitioner stated that "they were going to get theirs." Petitioner informed Mack and Williams of the driver's location. Petitioner subsequently got into the car with Williams and pointed out the house where the culprits lived. At the time, the white Cougar was still parked in the driveway. Petitioner was aware that Mack and his associates had shot up other places in the past, with the most recent being "about four months" before this incident, and he believed that someone had been killed during one of the incidents. Petitioner was also aware that Mack owned several high powered weapons. After the shooting, petitioner made comments to the effect that "It's been taken care of" and "we hit them."

11

In the present case, there was sufficient evidence for a rational trier of fact to conclude that petitioner intentionally set in motion a force likely to cause death or great bodily harm in obvious disregard of life-endangering consequences. Moreover, the fact that the white Cougar was still in front of the house at the time that petitioner pointed out the house to his accomplices was sufficient to put him on notice, contrary to his assertion, that persons would be present in the house when his accomplices returned to fire shots into the house, so as to support a finding of malice. *See State v. Sweat,* 2001 WL 1134604, *4 (Tenn. Crim. App. Sept. 26, 2001). Accordingly, the Michigan Court of Appeals' rejection of petitioner's sufficiency of evidence claim was not an unreasonable application of clearly established law so as to entitle petitioner to habeas relief on his second claim.

## IV. Conclusion

The Court will deny the petition for writ of habeas corpus. The Court will also deny a certificate of appealability to petitioner. In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484. A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States,* 310 F. 3d 900, 901 (6th Cir. 2002). A district court

therefore has the power to deny a certificate of appealability *sua sponte*. *See Dell,* 194 F. Supp. 2d at 658.

For the reasons stated in this opinion, the Court will deny petitioner a certificate of appealability because petitioner has failed to make a substantial showing of the denial of a federal constitutional right. *Dell,* 194 F. Supp. 2d at 659.

## V. ORDER

Accordingly,

IT IS ORDERED that the petition for a writ of habeas corpus is denied with prejudice.

IT IS FURTHER ORDERED that a certificate of appealability is denied.


                                                  S/Bernard A. Friedman_____
Dated: October 29, 2008                BERNARD A. FRIEDMAN
      Detroit, Michigan               CHIEF UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document
was served upon counsel of record by electronic and/or first-class mail.

S/Carol Mullins
Case Manager to Chief Judge Friedman